## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Case No. 11-cr-00267 (EGS)** |
|  | ) | **Sentencing Hearing: 3/18/13** |
| v. | ) |  |
|  | ) |  |
| **YOUNG N. CHO,** | ) |  |
| **Defendant.** | ) |  |
|  | ) |  |

## DEFENDANT'S MOTION TO ENFORCE PLEA AGREEMENT

Young N. Cho, through his undersigned counsel, respectfully moves this Court to enforce Mr. Cho's Plea Agreement with the government. The government has and continues to violate its contract with Mr. Cho in three ways: (1) it has unilaterally revised how forfeiture and restitution would be treated and suggested that it is somehow entitled to far more money than was contemplated and agreed to; (2) it has refused to intervene on Mr. Cho's behalf with immigration authorities despite the United States Attorney's explicit promise that he would personally intervene; and (3) it moved to revoke Mr. Cho's conditions of release based on an unfounded allegation that he obstructed justice by endeavoring to prevent Thomas Kwon from obstructing justice which will prejudice Mr. Cho's ability to serve his sentence in a more favorable facility.

The existence of a clearly established right to enforcement of plea agreements is well-settled black-letter law. In *Santobello v. New York*, 404 U.S. 257 (1971), the Supreme Court held: "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello*, 404 U.S. at 262. The Court outlined two remedies available to rectify the government's breach of a plea agreement: (1) rescission of the agreement through withdrawal of the guilty plea, or (2) specific performance of the agreement. 404 U.S. at 263. *See also Puckett v. United States*, 556 U.S. 129, 137, (2009). "[A] breach does not cause the guilty plea, when entered, to have been unknowing or

involuntary.  It is precisely *because* the plea was knowing and voluntary (and hence valid) that the Government is obligated to uphold its side of the bargain." *Puckett*, 556 U.S. at 137-38 (emphasis in original).  *See also United States v. Franco-Lopez*, 312 F.3d 984, 989 (9th Cir. 2002) ("[A] plea bargain may be enforced through specific performance [citations] or the defendant may be permitted to withdraw her guilty plea [citations].").  Here, Mr. Cho has already performed his plea agreement obligations.  Thus, he seeks specific performance of the government's promises to him.

## Background

On March 2, 2011, Mr. Cho began cooperating with the government in a bribery scheme involving contracting by the Army Corps of Engineers.  The government's *post hoc* supposition has been that it eventually would have discovered that the bribery Mr. Cho disclosed to it in March 2011.  But the discovery of the existence and scope of the ACE bribery scheme, and its eradication through an unbroken string of guilty pleas, is unquestionably attributable to Mr. Cho's extensive cooperation with the government.  As permitted by federal contracting rules, the indefinite delivery/indefinite quantity ("IDIQ") sole source contracts from which ACE officials skimmed were not competed.  Instead, charges were invoiced against sole source contracts a manner that largely would have precluded the government investigators from ever determining—absent Mr. Cho's cooperation—how much of each invoice amounted to a bribe (which the government terms "overhead") that the ACE officials who were demanding the bribes were requiring be structured into the contracts they were awarding.  This is because, on their face, the contract charges raised no glaring issues.  In fact, in some cases ACE officials demanded so much money from a contract that Mr. Cho, though his company, was forced to perform work for less than a contract's actual cost so that overall costs came within reasonable parameters.  (In such cases, overhead was not truly overhead, complicating how restitution might fairly be calculated.)

The government's lead investigator here, Federal Bureau of Investigation Special Agent Jay

Greenberg, certainly recognized Mr. Cho's importance to his investigation.  In May 2013, *Northern Virginia Magazine* published a story about this investigation, extensively quoting Special Agent Greenberg and other government investigators and prosecutors.  Its story reflects the government's acknowledgment that it was investigating unrelated allegations that individuals had knowingly submitted false "past performance" references to the Small Business Administration—not bribery involving ACE contracting officials—when Mr. Cho came forward.[1]  Before Mr. Cho began cooperating, these ACE contracts were even not on the government's radar.

*Northern Virginia Magazine* published its story after its reporter "debriefed" the government's prosecutors and investigators about the case Mr. Cho brought to them.  The publication confirmed that

> Alex Cho provided the crucial links in the case.  It was Cho who told investigators about the other key figures in the scheme.  Cho was talking so much that investigators had trouble keeping up.  He told them that the deals—which included payoffs to government officials—totaled somewhere near $10 million.  It was far bigger than any of the agents had known.  "Although we had evidence that Nova Datacom was involved in more than just false past performance references, Cho's information took the investigation to a higher level at warp speed," says Atkinson.  [Special Agent Howard] Arp was blunter: "This shit just got real," he told [Assistant United States Attorney Michael] Atkinson.

> The story Cho told them was amazing.  In 2006, Michael Alexander, who lived in Woodbridge and worked at the Army Corps of Engineers, had agreed with his colleague, Alexandria resident Kerry Khan, to work to steer Army Corps contracts to companies that would reward them with bribes.  Alexander and Khan had accrued so much trust at the Army Corps that they effectively acted unsupervised.  (At the same time they were stealing millions of dollars from the government, they got the highest possible performance ratings from their supervisors).

To *Northern Virginia Magazine's* reporter, SA Greenberg acknowledged:  "Generally, any great case you're going to make is based on a cooperator who agrees to work with you, because they're the

---

[1] *See* "High End Fraud", *Northern Virginia Magazine*, May 2013; accessed on 1-10-14 at: http://www.northernvirginiamag.com/education/business-features/2013/05/24/high-end-fraud/ (confirming that the government had been targeting the owner of a company called Med Trends for submitting false references).

ones who have access to the whole criminal conspiracy." This Court's experience also confirms that cooperation is the key to solving most conspiracy cases. Benefits are promised by law enforcement officials to induce insiders to cooperate.

Every person solicited for a bribe hopes the demand for bribes ends soon. Here, however, ACE officials were continuing to demand more from Mr. Cho, so much money that in providing the contracted for goods and services, Nova Datacom sometimes lost money. As Special Agent Greenberg explained during his *Northern Virginia Magazine* interview, the corrupt government officials and their family members were effectively treating Mr. Cho as though he was their bank. That bank closed—not because the government approached Mr. Cho with promises to induce his cooperation— but because Mr. Cho had had enough and made a decision, against others' advice to him, to come forward on his own.

In early 2011, Mr. Cho sought advice from trusted legal counsel about what he should do. The first attorney he spoke with told him to sit tight: to wait and see whether the government, which at that time was investigating whether other companies had made false statements in applications seeking to qualify for SBA 8(a) status, ever uncovered the bribery. Mr. Cho was told that upon payment of a $250,000 retainer, this attorney would, should the need arise, go to the prosecutors to negotiate the best deal possible. But Mr. Cho's criminal activities were ongoing—not over. ACE officials were continuing to demand bribe payments. Kerry Khan even insisted that Mr. Cho change Khan's broken light bulbs and fix his broken plumbing. Mr. Cho understood that continuing to "play ball" with these government officials meant that Mr. Cho would be committing additional crimes while anxiously waiting to learn whether the government's investigators uncovered any bribery before moving on to other matters. Plus, seeking a $250,000 payment to negotiate a guilty plea hardly seemed appropriate. To Mr. Cho, that demand was similar to those that he was seeking to end. Mr. Cho rejected that attorney's advice, obtained new counsel, and immediately

started cooperating with law enforcement authorities.  In fact, his cooperation arrived so quickly that the FBI was not able to secure the funds needed to pay the next-scheduled bribe.  The funds Mr. Cho used in the government's first sting operation, involving former government official Michael Alexander, were supplied by Mr. Cho.

During the course of Mr. Cho's cooperation he debriefed extensively and participated in numerous recorded meetings with the government's primary targets of this investigation— government officials who had for years required payments in return for awarding government contracts, and other contractors whose contracts were infected by bribes.  Even before Mr. Cho entered the very first plea in this case, on September 20, 2011, and despite early hiccups involving Mr. Cho's effort to insulate his sister— lead investigator Greenberg acknowledged Mr. Cho brought this case to law enforcement "on a silver platter."  This was obvious to SA Greenberg even before the numerous convictions that resulted from Mr. Cho's cooperation transpired.[2]  As a result of Mr. Cho's cooperation, every defendant has entered a guilty plea.

### Defendant's Plea Negotiations and Agreement

Steven J. McCool, who represented Mr. Cho during Mr. Cho's plea negations, has set forth in his declaration (attached hereto) information about how plea negotiations transpired.  He explains:

> Mr. Cho's primary concerns, which I expressed to the government during ongoing plea negotiations, were (1) reducing his exposure to incarceration while maintaining his ability to remain in this country with his family, and (2) eliminating his financial responsibility to the government by repaying all of the overhead he, his sister and Nova Datacom retained, and by assisting the government in tracing dirty funds and seizing tainted assets that others

---

[2] In its Motion for Section 5K1.1 Downward Departure and Memorandum in Aid of Sentencing (Document 56) the government writes that "[t]he recordings and information provided by Cho during the time of his cooperation were crucial to the government's eventual prosecution of the other perpetrators."  *Id.* at 7.  The government identifies twelve other perpetrators, not including a former Army contracting officer Mr. Cho also helped target that the government calls "Public Official C."

received.  "Overhead" is a term the government used during plea negotiations, which the prosecutors defined as money included in contracts that was promised but not paid out as bribes and [which funds] were under Mr. Cho's, his sister's or Nova Datacom's control.

*See* Declaration of Steven J. McCool, attached as **Exhibit 1**, at ¶5.

These prime concerns were specifically addressed in Mr. Cho's Plea Agreement (filed with this Court as Document 8).  In the two paragraphs appearing at the top of page six (which correspond to the last two paragraphs of the Plea Agreement's enumerated Paragraph 5), Mr. Cho's Plea Agreement included special forfeiture and restitution language that appeared in his and his sister's plea agreements *but not in any other defendant's plea agreement.*  This special language was included to memorialize the government's agreement that Mr. Cho's financial exposure would be far more limited that joint and several liability with the corrupt government officials might permit.  Mr. Cho and his sister were to be liable only for the "dirty" money that he, his sister and their company received from contracts which had been requested by government officials and which had not already been paid to these officials, or to their cohorts, before the government's investigation commenced.  This specially apportioned liability forfeiture and restitution language was specially negotiated and provided as follows:

> Subject to your client's adherence to every provision of this Agreement, including his obligations to cooperate with this Office, this Office agrees to maintain at sentencing, and to file all necessary documents with the Court to reflect, that your client's forfeiture money judgment be the value of the proceeds retained by your client, by Nova Datacom, or by any former or current principals of Nova Datacom arising from the conduct described in the Statement of Offense (less credits for forfeiture payments made to the United States by your client, by Nova Datacom, or by any of its current or former principals arising from the conduct described in the Statement of Offense).

> Subject to your client's adherence to every provision of this Agreement, including his obligations to cooperate with this Office, this Office agrees to recommend at sentencing that the Court apportion liability for restitution to reflect your client's role in the offenses charged in the Information.

Later, Mr. Cho's Plea Agreement also includes boilerplate sections that describe the standard restitution obligation (Paragraph 10) and the standard forfeiture obligation (Paragraph 11).  But the

Plea Agreement specifically notes that these later sections are subject to the special apportionment provisions inserted in Paragraph 5.  The apportioned liability was, in Mr. Cho's and his sister's cases, to be limited to the "overhead" that he and his sister (and their company, Nova Datacom) continued to retain at the time of their sentencing.[3]  In short, if all of the overhead was paid back before sentencing, the parties understood that there would be no forfeiture ordered—period.  They also understood that if the forfeited property was returned to the victim—here the very same government that was obtaining title to forfeited property—there would be no need for any restitution.

By agreeing to these provisions, the government gave Mr. Cho and his sister an incentive to provide assets to the government prior to their sentencings that would be sufficient to offset any retained overhead that existed when their cooperation commenced.  Consistent with the parties' understandings, Mr. Cho and his sister promptly started to provide millions of dollars to the government:  before their sentencings, before their Plea Agreements became final, and even before the amount of overhead was determined (or eventually stipulated).  *See* e.g., Declaration of Steven J. McCool at ¶8.  Consistent with the Plea Agreements and with a course of conduct that establishes the parties intent at the time, after they entered guilty pleas, Mr. Cho and his sister continued to offer more of their assets—including hundreds of thousands of dollars that were paid to their company by Copper River (the company that acquired Nova Datacom's assets).  The Copper River funds were to be used to reduce further their obligation to return the "net value"[4] of the overhead

---

[3] As Mr. McCool explains, "overhead" was used to describe the dirty money that remained with Mr. Cho, his sister, or the company—the amount of inflation built into each contract by government officials that had been paid to Mr. Cho, his sister or to Nova Datacom and which a government official still expected to receive.  *See* Declaration of Steven J. McCool at ¶5.

[4] Mr. Cho, his sister and Nova Datacom were also to have received credit (as a deduction from any funds they would be required to forfeit) for any taxes they owed and paid to the federal government as a result of their retention of overhead.  This was because taxes they paid against the dirty money

they initially had retained.  Assuming the victim received these dollars, nothing more would have been required from Mr. Cho or his sister.

Now, after their cooperation no longer appears necessary, the government has tried to revise the deal.  It asserts that Mr. Cho, his sister and Nova Datacom (which does not even exist) should be held jointly and severally liable with Kerry Khan for $17,220,247.83.  Additionally, the government now alleges that Mr. Cho also should be held jointly and severally liable with Lee Khan and Michael Alexander for $1.651 million, and that the Chos' effort to use the Copper River receivable to reduce the value any remaining overhead (dirty money they continue to retain) should be disallowed.  According to the government, notwithstanding the Plea Agreement's use of "apportioned" language and its omission of "joint and several liability" language, and notwithstanding the parties' prior course of conduct, applying the Copper River funds "to the forfeiture money judgment [entered in Min Cho's case] . . . is not the defendant's choice to make." This statement is patently false.  The government's effort to prevent Min Cho from extinguishing her money judgment, and Alex Cho from being subjected to one, is utterly inconsistent with the promises made to Alex Cho.  Frankly, alongside the Plea Agreement and prior history, seeking to prevent the Chos from satisfying their financial obligation so that the government can continue to use forfeiture tools to collect more of their assets may be unprecedented, and is vindictive.

Mr. Cho also was to remain on release following his entry of his guilty plea—pending his sentencing.  *See* Plea Agreement, ¶ 12, page 11.  In Paragraph 12, the government specifically promised that it would "not seek a change in [Mr. Cho's] release conditions pending sentencing [and] that the final decision regarding [Mr. Cho's] bond status or detention w[ould] be made by the

---

they had been holding for others (that is, any taxes paid on "overhead") reduced the retained overhead in a way that also accrued to the government.  In reaching a compromise money judgment figure with Min Cho, the government gave her credit for some of the taxes she paid.  Mr. Cho, however, received no credit.  But the resolution he proposes here would render that concern moot.

Court at the time of [Mr. Cho's plea of guilty.  This was important not just so that he could earn income to set up his family financially during the time he was incarcerated and to eliminate any overhead balance (so that there would be no financial obligation to the government), but also because the conditions of his confinement would be more favorable if he were permitted to self-report.

As this Court knows, during an emergency status hearing that the government requested for November 4, 2011, the government sought revocation of Mr. Cho's release pending his sentencing. According to the government, moving to modify Mr. Cho's release conditions was appropriate because he breached his plea agreement and was now likely to flee because he might no longer qualify for a Sentencing Guidelines departure.  Neither statement was true.  Mr. Cho was hardly a flight risk:  the government knew that Mr. Cho, who lacks citizenship, was working hard to stay in this county, not to flee it.  (Indeed, Mr. Cho could have fled with millions of dollars long before the government uncovered the bribery case, assuming it ever did, if that had been his plan.)  In fact, as Mr. McCool's declaration indicates, his plea negotiations involved securing from the United States Attorney a promise to intervene personally in Mr. Cho's immigration matter in an effort to ensure that Mr. Cho would remain in this county after completion of his sentence.

Moreover, Mr. Cho was not in breach of a plea agreement that did not even exist when he told target Thomas Kwon—whom Mr. Cho considered to be like an older brother[5]—that Mr. Cho

---

[5] During Mr. Cho's prior involvement in the criminal justice system, Mr. Kwon was the only person to offered financial assistance.  Because of Mr. Kwon's assistance, Mr. Cho was able to retain legal counsel.  Despite that loyalty, Mr. Cho did  disclose his knowledge of Mr. Kwon's involvement in this case (before he was told to wear a wire against Mr. Kwon in August 2011).  To Mr. Cho, however, wearing a wire against Mr. Kwon presented an impossibly difficult choice—a "Sophie's Choice."  Special Agent Jay Greenberg understood Mr. Cho's concerns and had conversed with Mr. Cho about how Mr. Kwon might "come in" voluntarily, as Mr. Cho and his sister did.  At the time, Mr. Cho believed that a person who confessed to the government pre-arrest would receive more favorable treatment.  Unfortunately, Special Agent Greenberg, with whom Mr. Cho had a good relationship, was not present when Mr. Cho was required to try to create additional evidence against

was wearing a wire in the hope to preventing Mr. Kwon from possibly committing obstruction of justice himself.  The Plea Agreement explicitly says what logic requires:  that failures to perform obligations imposed under the Plea Agreement can only occur "*after entering this Agreement*[.]"  Plea Agreement at ¶13, page 11 (emphasis added).

Furthermore, Mr. Cho's conduct was not obstruction of justice.  In the Supreme Court's unanimous 2005 *Arthur Andersen* decision, which overturned an obstruction of justice conviction, the Court recognized that fair notice, which is inherent in the Constitution's due process clause, prohibits the government from prosecuting as obstruction of justice all conduct it considers to have interfered in its investigations.  The Court recognized that conduct which interferes with a government investigation is not necessarily illegal.  The Court explained:

> "persuading" a person "with intent to . . . cause" that person to "withhold" testimony or documents from a Government proceeding or Government official is not inherently malign.  Consider, for instance, a mother who suggests to her son that he invoke his right against compelled self-incrimination . . . or a wife who persuades her husband not to disclose marital confidences[.]  Nor is it necessarily corrupt for an attorney "to persuade" a client "with intent to . . . cause" that client to "withhold" documents from the Government.

*Arthur Andersen LLP v. United States*, 544 U.S. 696, 703-04 (2005).  Any competent defense attorney who anticipated that her client might be confronted with a possible "sting" scenario would advise her client to avoid instructing a witness to lie to investigating authorities.  Mr. Cho was not required to have been Mr. Kwon's counsel before he tried, like Mr. Kwon's own attorney might try, to prevent Mr. Kwon from committing a new crime.

This Court revoked Mr. Cho's release status but invited Mr. Cho to file a motion for

---

Mr. Kwon during the government's staged recorded conversation.  In its Memorandum in Aid of Sentencing, the government acknowledges that Mr. Cho "was remarkably effective in eliciting incriminating statements and actions."  What the government fails to report, however, is that while Mr. Cho was being forced by government agents to try to "sting" Mr. Kwon, *Mr. Cho was actually crying*.  Had Special Agent Greenberg been involved, the fiasco of hastily forcing Mr. Cho into this particular sting would never have occurred.

reconsideration of its decision.  But if he did, the government said, it would move for Mr. Cho's

immediate sentencing—well before the success of his cooperation would be known to this Court.

*See* Declaration of Steven J. McCool at ¶9.  And, until recently, the government was insinuating that

working to bring at least thirteen people to justice might not suffice to qualify as "substantial

assistance."  That argument in favor of detention is now moot.  The government agrees that a

sentencing departure is deserved.

 Pursuant to the terms of his plea agreement, the United States Attorney also promised to

intervene personally to assist Mr. Cho in his efforts to remain in the United States.  *See* Declaration

of Steven J. McCool at ¶7.  The government has indicated that will no longer provide any

immigration assistance to Mr. Cho, asserting that by trying to prevent Thomas Kwon from

obstructing justice himself, Mr. Cho somehow violated the terms of a plea agreement that did not

even then exist.  *See* Declaration of Steven J. McCool at ¶10.

### Defendant's Requested Relief

 This Court should order the government to perform its Plea Agreement obligations.

Specifically:

### 1. Properly Allow Forfeiture and Limit Restitution.

 The Plea Agreement limits forfeiture to the overhead that the Chos retained—that is the

inflated amounts of the contracts that had had not yet paid out to the government employees who

had demanded bribe payments before Alex Cho started to cooperate in March 2011 (and continued

to demand them).  With that understanding, Mr. Cho and his sister began to relinquish property to

the government, effectively disgorging considerable overhead to satisfy the anticipated forfeiture

amount.  Even in calculating the gross amount, the government appears to have failed to credit all of

the cash that Mr. Cho had paid over the years to Kerry Khan and Mike Alexander.  It knew about

the cash payments and even found approximately $100,000 in Mr. Alexander's home.  But Mr. Cho

is willing to agree to treat the amount negotiated with his sister and her attorneys as a starting point, provided that the Court rejects the government's recent effort to refuse to allow the Chos to use their money to further reduce the forfeiture judgment.  Mr. Cho, his sister should get credit for the $611,000 Copper River receivable and for what Mr. Cho's counsel understands also to exist:  a $90,000 receivable owed to Nova Datacom by ACE.

There was to be no restitution owed above and beyond the forfeiture amount and the government was to recommend that the forfeiture funds it received would off-set the restitution amount.  A conforming proposed order of forfeiture (consistent with the Plea Agreement) is attached.

**2.      Enforce Promised Immigration Assistance.**

During plea negotiations, the government promised to intervene to attempt to prevent Mr. Cho's deportation.  Mr. Cho's attorney was specifically told that the United States Attorney would make a call himself to the head of Immigration and Customs Enforcement ("ICE"), John Morton at the time, to advocate on Mr. Cho's behalf and to describe all of the assistance Mr. Cho had provided to the government in dismantling the Khan/Alexander Army Corps bribery scheme.  Although Mr. Morton has left ICE, the Government should still be ordered to intervene on Mr. Cho's behalf. Given the government's unenthusiastic support for this effort, however, Mr. Cho requests that the intervention occur in writings that are subject to his (and this Court's) prior review and consent.

**3.      Permit Release to Self-Report.**

Requesting revocation of Mr. Cho's release status affected not just Cho's ability to earn income to extinguish his financial debt to the government and his ability to earn money to support his family during his incarceration, but also will affect the conditions of any future incarceration. The earned income opportunity has passed, but conditions could be fashioned to permit Mr. Cho's release pending sentencing and to permit him to self-report.  Counsel understands that self-reporting

(in addition to intervention with immigration authorities) will affect favorably (and materially) the

scoring Mr. Cho receives under the Bureau of Prison's Inmate Classification System.

      WHEREFORE, Mr. Cho respectfully requests that his motion be granted and that these

important conditions of his Plea Agreement be enforced.

                         Respectfully submitted,

                         **WILLIAM COWDEN, LLC**

           By:       /s/ William R. Cowden
                    William R. Cowden
                    (DC Bar No. 426301)
                    1150 Connecticut Avenue, N.W., Ste 900
                    Washington, DC 20036
                    (202) 828-4100 (main)
                    (202) 642-0209 (direct)
                    (202) 828-4130 (fax)
                    wcowden@cowdenllc.com

## CERTIFICATE OF SERVICE

      I hereby certify that, on this 10th day of January 2014, I caused a true and correct copy of the
foregoing to be served electronically by means of the Court's ECF system to all counsel of record.

             /s/
             William R. Cowden