## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 11-267 (EGS)** |
| **v.** | : | |
| | : | |
| **YOUNG N. CHO, a/k/a ALEX CHO,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO ENFORCE PLEA AGREEMENT

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the "Motion to Enforce Plea Agreement" filed by defendant Young N. Cho, a/k/a Alex Cho (Document No. 62). As grounds for this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing or argument, if any, on the motion.

## FACTUAL BACKGROUND

Young N. Cho, a/k/a Alex Cho ("the defendant"), stole over $20 million from the United States Army Corps of Engineers ("USACE") between 2008 and March 2011. The defendant accomplished this feat by inflating invoices on government contracts obtained by Nova Datacom, LLC ("Nova Datacom"), a government contractor for which he was Chief Technology Officer. The defendant then used much of the stolen money to pay bribes to public officials in exchange for government contracts. The defendant was assisted in this enterprise by his sister, Min Cho, who was the President of Nova Datacom. The defendant engaged in numerous other crimes during his time at Nova Datacom, as described in his Statement of Offense (Document No. 9) and the government's sentencing memorandum (Document No. 56).

On March 3, 2011, the defendant debriefed with investigators for the first time.  Shortly thereafter, at the direction of law enforcement, the defendant began to engage in consensually recorded meetings and telephone calls with targets of the investigation.  During this time, the defendant continued to debrief with investigators.  The defendant provided false and misleading information to investigators from March 3, 2011 through June 2, 2011, concerning bribe payments to a former Army contracting officer, Public Official C, as well as the knowledge of Min Cho and the defendant's close personal friend, Thomas Kwon ("Kwon"), concerning the bribery scheme.  After the defendant was confronted by investigators on June 2, 2011, he admitted to intentionally withholding information on the bribe payments to Public Official C because he knew such information would implicate Min Cho and Kwon.  The defendant also admitted that Kwon and he destroyed records before the defendant began cooperating that would have implicated Public Official C and Kwon in the bribery scheme.

Despite the defendant's admissions that he obstructed the investigation both before and after he began cooperating, the defendant continued to cooperate with investigators as part of the covert investigation after June 2, 2011.  The defendant agreed to assist investigators by, among other things, engaging in consensually recorded calls and meetings with Kwon in an effort, in part, to corroborate the defendant's statements to investigators that Kwon had bribed Public Official C.  On August 18, 2011, at the request of law enforcement, the defendant met with Kwon and Min Cho at Nova Datacom's offices.  When the meeting began, the defendant intentionally and silently motioned to Kwon that the defendant was wearing a recording device. The defendant also wrote down on a piece of paper that Kwon should say back to the defendant, in substance, "tell them the truth."  The defendant showed the piece of paper to Kwon.  As

prompted by the directions written down by the defendant on the piece of paper, Kwon can be heard on the recording telling the defendant, in substance, to "tell them the truth" in response to questions put to Kwon by the defendant.  During the meeting, Kwon mentioned Public Official C.  In response, according to Kwon, the defendant silently motioned to Kwon to refrain from discussing Lim.  Kwon understood that the intent of the defendant's messages was to protect Kwon in the criminal investigation.

Neither the defendant nor Min Cho told the government about the defendant's conduct in the August 18 meeting.  The government and the defendant proceeded to negotiate a written plea agreement (Document No. 8).  The defendant signed the plea agreement on September 8, 2011, stating:

> I have read this Plea Agreement and have discussed it with my attorney, Steven McCool, Esquire.  I fully understand this Agreement and agree to it without reservation.  I do this voluntarily and of my own free will, intending to be legally bound.  No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully.  I am pleading guilty because I am in fact guilty of the offense(s) identified in this Agreement.
> I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Plea Agreement.  I am satisfied with the legal services provided by my attorney in connection with this Plea Agreement and matters related to it.

Plea Agreement at 14 (emphasis added).  The defendant's counsel at the time, Steven J. McCool ("Attorney McCool") signed the written plea agreement that same day, stating:

> I have read each of the pages constituting this Plea Agreement, reviewed them with my client, and discussed the provisions of the Agreement with my client, fully.  These pages accurately and completely sets [sic] forth the entire Plea Agreement.  I concur in my client's desire to plead guilty as set forth in this Agreement.

Id. (emphasis added).

On September 20, 2011, the defendant pleaded guilty to a two-count Information, which charged conspiracy to commit bribery, money laundering, and wire fraud, in violation of 18 U.S.C. § 371, and bribery of a public official, in violation of 18 U.S.C. § 201.   At the plea colloquy on September 20, 2011, while under oath, the defendant assured Magistrate Judge Facciola that the written plea agreement he had signed on September 8, 2011, was the complete agreement between him and the government, and that no side agreements existed:

> THE COURT: . . . Did you carefully review this document with your lawyer before you signed it?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Are there any – Is there any part of it that is unclear, and you wish to ask me any questions about it?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: So I take it then, it is a full and complete statement of the agreement between yourself and the United States?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Are there any other promises or assurances given you, that are not in this Agreement?
>
> THE DEFENDANT: No, Your Honor.

Plea Hearing Tr. 11-12, Sept. 20, 2011.[1]   The government did not request that the defendant be detained after he pleaded guilty, and the defendant was placed on personal recognizance.

On November 3, 2011, Kwon met with investigators and voluntarily disclosed the defendant's conduct in the August 18 meeting.   The defendant had not disclosed the conduct to investigators before this.   Following Kwon's disclosure, the government moved for an

_____

[1]      The defendant's current attorney, William R. Cowden, represented the defendant at the plea hearing.

4

emergency status hearing, which took place on November 4, 2011.   At that hearing, the government orally moved to revoke the defendant's conditions of release.   The defendant opposed this motion but did not deny Kwon's allegations.   In fact, earlier that same day the defendant met with investigators and admitted to a) planning, prior to the meeting, to alert Kwon that the defendant was wearing a recording device so that Kwon would not make damaging statements that could be used against him by law enforcement; b) alerting Kwon, as planned; and c) telling Kwon what to say by mouthing the words "tell the truth" to Kwon and, when that failed, writing "say 'tell the truth'" on a piece of paper and showing it to Kwon.   At the conclusion of the hearing, the Court granted the government's motion and revoked the defendant's release conditions.   The defendant remains in custody.

On October 29, 2013, the government filed its sentencing memorandum and motion for a downward departure under Section 5K1.1 of the United States Sentencing Guidelines, in which it recommended a post-departure sentence of 100 months.   On November 12, 2013, the day his own sentencing memorandum was due, the defendant instead filed a motion to continue the sentencing scheduled for November 19, 2013, and asked for additional time to file his memorandum.   At a status hearing on November 19, 2013, the defendant indicated he planned to file a motion and asked for a briefing schedule.   On January 10, 2014, the defendant filed his "Motion to Enforce Plea Agreement" (hereinafter, "defendant's motion" or "Def.'s Mot.").   The defendant still has not filed his sentencing memorandum.   Sentencing is scheduled for March 28, 2014.

## **LEGAL PRINCIPLES**

"A 'plea agreement is a contract,' and 'courts will look to principles of contract law to determine whether a plea agreement has been breached.'" In re Sealed Case, 686 F.3d 799, 802 (D.C. Cir. 2012) (quoting United States v. Jones, 58 F.3d 688, 691 (D.C. Cir. 1995)).  "In the context of plea agreements, the defendant maintains the burden of proving that the agreement has been breached." United States v. Ahn, 231 F.3d 26, 36 (D.C. Cir. 2000).

Reducing a plea agreement "to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement creates a presumption that the agreement is integrated." Ahn, 231 F.3d at 35.  An integration clause is a clause in a written agreement that "specifically state[s] that no other agreements or promises existed between the parties." Id. at 36.  "[I]ntegration clauses establish that the written plea bargain was adopted by the parties as a complete and exclusive statement of the terms of the agreement." Id. (internal quotation marks omitted) (quoting United States v. Fentress, 792 F.2d 461, 464 (4th Cir.1986));[2] see also In re Sealed Case, 686 F.3d at 803 (holding that the integration clause in the plea agreement barred oral modifications).  Standing alone, an integration clause is "strong evidence that no implied promise existed" outside the written plea agreement.  Ahn, 231 F.3d at 36. Inferring such a promise is "virtually foreclosed" where, in addition to the inclusion of an

[2]       Citing United States v. Hunt, 205 F.3d 931, 935 (6th Cir. 2000) (holding that a merger clause "normally prevents a criminal defendant, who has entered into a plea agreement, from asserting that the government made oral promises to him not contained in the plea agreement itself"); United States v. Alegria, 192 F.3d 179, 185 (1st Cir. 1999) ( "Where, as here, an unambiguous plea agreement contains an unqualified integration clause, it normally should be enforced according to its tenor."); United States v. Doyle, 981 F.2d 591, 594 n.3 (1st Cir. 1992) (explaining that this rule "has particular applicability when, as in this case, the plea agreement itself specifically states that 'there are no further or other agreements, either express or implied,' other than those explicitly set forth in the document").

integration clause in the written plea agreement, the district court has conducted a plea hearing in which the defendant was made fully aware of, and assented to, the important terms of the agreement.  United States v. West, 392 F.3d 450, 456 (D.C. Cir. 2004).

### ARGUMENT

The defendant's motion alleges that the government has violated the terms of the plea agreement, and he requests three forms of relief.  The defendant fails to meet his burden to prove that the government has breached the plea agreement in any way, and the Court should not grant any of the requested relief.[3]

**I.      The Court Should Deny the Defendant's Requests Related to Forfeiture and Restitution**

After stealing over $20 million from USACE, the defendant now asks the Court to find he only owes $1,399,000.00.  He alleges that the government has violated the terms of the plea agreement with regard to forfeiture and restitution, and he asks the Court to sign his proposed order of forfeiture.  The Court should deny the defendant's requests because the defendant has failed to establish that the government has violated or will violate the plea agreement, and his proposed forfeiture and restitution amounts are unsupported by evidence.

Accompanying this opposition brief are proposed orders of forfeiture and restitution that the government will ask the Court to sign at sentencing, along with a declaration from forensic

---

[3]      The government believes the defendant violated the cooperation provision of his plea agreement by failing to disclose to the government, after the plea, his obstructive conduct that predated the plea – namely, his actions in the meeting with Kwon on August 18, 2011.  The government does not and will not make that argument for purposes of the instant motion, however, because the government does not believe it is necessary for resolution of the motion. The Court may assume, for purposes of this motion only, that the defendant has not violated his plea agreement.

accountant Maria Boodoo of the United States Attorney's Office (Exhibit A) and accompanying charts (Exhibits B and C) that explain the government's recommended restitution and forfeiture amounts.  The Court should order forfeiture of $7,999,101.92 and restitution of $17,220,247.83.[4]

### A.    Forfeiture

In the written plea agreement, the defendant agreed "to the forfeiture of a money judgment in favor of the United States for a sum of money equal to the value of the property constituting or derived from any and all proceeds [the defendant] obtained, directly or indirectly, as a result of the violations alleged" in the Information.  Plea Agreement ¶ 11(a).  Regarding the defendant's cooperation, the written plea agreement states:

> Subject to your client's adherence to every provision of this Agreement, including his obligations to cooperate with this Office, this Office agrees to maintain at sentencing, and to file all necessary documents with the Court to reflect, that your client's forfeiture money judgment be the value of the proceeds retained by your client, by Nova Datacom, or by any former or current principals of Nova Datacom arising from the conduct described in the Statement of Offense (less credits for forfeiture payments made to the United States by your client, by Nova Datacom, or by any of its current or former principals arising from the conduct described in the Statement of Offense).

Id. ¶ 5.

In accordance with the written plea agreement, the government is seeking a forfeiture money judgment equal to the value of the proceeds retained by the defendant, Nova Datacom, and a principal of Nova Datacom (Min Cho), less credits for forfeiture payments made to the United States by those three parties.  The calculation of this money judgment is described in Exhibit C.  The defendant, Min Cho, and Nova Datacom retained $10,115,184.40 in money they stole from USACE through inflated invoices.  Credited against this amount is a total of

---

[4]      Due to an editing error, the government failed to include the specific recommended forfeiture amount in its sentencing memorandum.

$2,116,082.48 in unpaid invoices submitted by Nova Datacom for work it claims to have performed, resulting in a forfeiture judgment of $7,999,101.92.  Following the entry of the order of forfeiture, the government will file a notice with the Court that the balance remaining on the money judgment is $3,214,153.76, as a result of $4,784,948.16 credited toward the forfeiture judgment.  This credit consists of $3,877,834.62 in funds already forfeited to the government from the defendant, Min Cho, and Nova Datacom, and $907,113.54 returned to USACE by EyakTek as part of a civil settlement.[5]

In his proposed order of forfeiture, the defendant asks the Court to find that the defendant, Min Cho, and Nova Datacom retained $6,884,948.16 and that, after credit for "funds and other properties to the United States," the outstanding forfeiture obligation is $2,100,000.00.[6]  See Def.'s Proposed Order of Forfeiture at 2.  The defendant provides no justification for his assertion that the "retained overhead" was $6,884,948.16, because he has none.  The defendant took this figure from the negotiated forfeiture settlement the government reached with Min Cho and Nova Datacom.  He then subtracted the $4,784,948.16 in credits toward forfeiture to reach the $2,100,000.00 outstanding forfeiture obligation.  He now admittedly wants to use the $2,100,000 figure as "a starting point" for the forfeiture calculation, and asks the Court to intervene to help him work this number even lower.  Def.'s Mot. at 11-12.

---

[5]     The value of the substitute property forfeited from Min Cho and Nova Datacom will also eventually be applied to the defendant's money judgment amount.  After the sale and the disposition of the two real properties forfeited as substitute assets, the United States will file another notice with the Court as to the balance that remains on the defendant's forfeiture money judgment amount as a result of the sale and disposition of all the substitute property forfeited from Min Cho and Nova Datacom.

[6]     The defendant then asks the Court to credit additional amounts to get his forfeiture obligation down to $1,399,000.00.  See Def.'s Proposed Order of Forfeiture at 3.

The problem with the defendant's approach is that he has nothing to support his numbers. The $6,884,948.16 forfeiture obligation the government agreed to with Min Cho and Nova Datacom was not based on a calculation of retained stolen money; as described herein, the defendant, Min Cho, and Nova Datacom retained much more than that.   Instead, the $6,884,948.16 figure was simply a negotiated settlement – a number specifically chosen by the government, Min Cho, and Nova Datacom so that after $4,784,948.16 was credited toward forfeiture, the outstanding forfeiture obligation would be the round number of $2,100,000.00. The government agreed to a forfeiture obligation with Min Cho and Nova Datacom that was lower than the actual retained proceeds in exchange for not having to litigate forfeiture matters with Min Cho and Nova Datacom and for getting a forfeiture order entered so that the government could begin pursuing substitute assets.[7]

The government offered this same compromise to the defendant, and he rejected it. Then he filed his motion.  The negotiation is now over, and the government and the defendant must litigate the defendant's forfeiture obligation.   The Court must decide the forfeiture obligation based on evidence and actual calculations, not made-up figures.   The government provides evidence and calculations to support its numbers herein and in the attached declaration and charts.  The defendant has provided neither.

### 1. The defendant, Min Cho, and Nova Datacom retained $10,115,184.40 of the stolen money.

The defendant does not appear to dispute that the sum of the inflated amounts paid by USACE was $20,243,443.85.  In order to determine the portion of this sum that the defendant,

---

[7]     The defendant acknowledges in a footnote that Min Cho's forfeiture obligation was a "compromise money judgment."  Def.'s Motion at 7-8 n.4.

Min Cho, and Nova Datacom retained, the government subtracted the known bribe payments made by the three parties, which totaled $10,128,259.45, to reach a total retained amount of $10,115,184.40.[8]  See Exhibit C.

### 2. The government credited the defendant for $2,116,082.48 in unpaid invoices submitted by Nova Datacom to EyakTek.

As shown in Exhibit C, the government credited against the retained amount $2,116,082.48 in unpaid invoices Nova Datacom submitted to Eyak Technology LLC ("EyakTek") for work on USACE contracts that Nova Datacom claims to have performed, resulting in a forfeiture obligation of $7,999,101.92.

### 3. The defendant, Min Cho, and Nova Datacom have paid $4,784,948.16 toward forfeiture.

As shown in Exhibit C, the defendant, Min Cho, and Nova Datacom have paid $4,784,948.16 toward forfeiture thus far.[9]  The defendant appears to agree with this figure.[10]

---

[8]  In his motion, the defendant claims that the government failed to credit all of the cash that the defendant paid to co-conspirators Kerry Khan and Michael Alexander. Def.'s Mot. at 11. The defendant has not identified in his motion which payments the government allegedly failed to credit. The government is not aware of any cash payments to Kerry Khan that have not already been credited. In interviews in March 2011, the defendant claimed that he paid Alexander approximately $200,000 in cash from February 2010 to March 2010. The government did not initially credit the defendant for these alleged payments because the payments cannot be verified and Alexander did not corroborate the amounts. The government recently decided, for purposes of resolving the issue, to credit the defendant with this $200,000 in alleged bribe payments to Alexander, and this is reflected in Exhibit C.

[9]  This amount includes $907,113.54 that was returned to USACE by EyakTek as part of a civil settlement.

[10]  In his proposed order of forfeiture, the defendant claims that he, Min Cho, and Nova Datacom provided "funds and other properties to the United States that caused the initial value of retained overhead to be reduced to the current retained overhead amount to $2,100,000.00." Def.'s Proposed Order of Forfeiture at 2. The defendant claims the initial retained amount was $6,884,948.16, and the "current retained overhead amount" is

After this sum is credited toward the forfeiture obligation of $7,999,101.92, the defendant still owes $3,214,153.76.

### 4.    There was no alleged side agreement with regard to taxes paid.

The defendant claims in a footnote in his motion that the government agreed to credit against his forfeiture amount the taxes allegedly paid by him, Min Cho, and Nova Datacom. Def.'s Motion at 7-8 n.4.   In support, the defendant has submitted a sworn declaration by Attorney McCool that states, in relevant part: "With respect to the forfeiture issue, it is also my recollection that Mr. Cho was to receive credit for taxes paid on the overhead amounts he had previously retained."   McCool Decl. ¶ 8.   Attorney McCool's declaration is insufficient support for the defendant's argument, even if the Court were to credit it, which the Court should not.[11]

First, Attorney McCool does not state that the defendant was to receive credit for taxes paid on overhead amounts that Min Cho and Nova Datacom retained.   He states that the defendant was to receive credit for "taxes paid on the overhead amounts he had previously retained."   McCool Decl. ¶ 8 (emphasis added).   Thus, the defendant's claim that the government agreed to credit against his forfeiture amount the taxes paid by Min Cho and Nova Datacom remains completely unsupported.

Second, the Court should not credit even Attorney McCool's claim that the defendant was to receive credit for taxes the defendant himself paid.   Attorney McCool offers a

---

$2,100,000.00, so by his calculations, the defendant, Nova Datacom, and Min Cho have provided the United States with $4,784,948.16 toward forfeiture thus far.

[11]     It is not clear from the defendant's motion whether he is also claiming there was an agreement to credit taxes paid against his <u>restitution</u> amount.  Attorney McCool's declaration states specifically that his recollection pertains only to forfeiture, so there is no support for such a claim.

"recollection" but does not offer a single detail about the basis for his recollection.  He does not state that any prosecutor actually told him, much less agreed, that the defendant would receive credit for taxes paid.  Moreover, Attorney McCool's "recollection" is contradicted by the written plea agreement that he and the defendant signed.   Under the clear terms of the written plea agreement, the forfeiture amount is equal to "the value of the property constituting or derived from any and all proceeds [the defendant] obtained, directly or indirectly, as a result of" the violations.  Plea Agreement ¶ 11(a).  With regard to credits, the government agreed "to credit toward the satisfaction of the money judgment any funds [the defendant] has forfeited to the Government prior to the time of sentencing."  Id.  The written plea agreement contains no promises to credit any other funds, including taxes.

The written plea agreement does contain an integration clause, however.  The clause, entitled "Complete Agreement," states:

> No other agreements, promises, understandings, or representations have been made by the parties or their counsel than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Plea Agreement ¶ 16.  The defendant and Attorney McCool signed the written plea agreement on September 8, 2011, and affirmed that they had read the written plea agreement, and that no side agreements existed outside that written plea agreement.  Id. at 14.  The defendant affirmed: "These pages accurately and completely sets [sic] forth the entire Plea Agreement."  Id. Attorney McCool affirmed: "I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Plea Agreement."  Id.  At the plea colloquy on September 20, 2011,

13

while under oath, the defendant assured Magistrate Judge Facciola that the written plea agreement was the complete agreement between him and the government, and that no side agreements existed.  Plea Hearing Tr. 11-12, Sept. 20, 2011.  The defendant's current attorney, William R. Cowden ("Attorney Cowden"), was the defendant's counsel and present at the defendant's plea hearing.   Attorney Cowden did not contradict the defendant's specific acknowledgement at the plea hearing that there were no promises or assurances outside the written plea agreement.

The combination of the integration clause, the affirmations of the defendant and Attorney McCool in the written plea agreement, the defendant's statements while under oath during the plea colloquy, and Attorney Cowden's silent acquiescence during that colloquy forecloses the existence of any promises outside of the written plea agreement.  See West, 392 F.3d at 456.  To the extent Attorney McCool's "recollection" could be construed to imply that the government promised to credit taxes paid against the defendant's forfeiture, this recollection should not be credited.

The government had good reason not to agree to credit against the forfeiture amount taxes allegedly paid by the defendant.  A defendant who pays taxes on ill-gotten gains is not entitled to a corresponding deduction on his forfeiture money judgment.  See United States v. DeFries, 129 F.3d 1293 (D.C. Cir. 1997) (holding that taxes paid should not be credited against forfeiture under RICO's forfeiture provision); United States v. McHan, 101 F.3d 1027, 1042 (4th Cir. 1996) ("The proper measure of criminal responsibility generally is the harm that the defendant caused, not the net gain that he realized from his conduct.").  Moreover, prior to the

plea, the defendant had not identified any taxes he paid on stolen money he retained, and he still has not provided this information.

**5.    The Copper River receivable should not be credited toward forfeiture.**

The defendant requests that the Court apply a $611,000 receivable in Nova Datacom's possession to his forfeiture amount.  The government is not in possession of this receivable.  The government will request that Nova Datacom turn over the funds from this receivable to the clerk of the court as payment toward the restitution obligation of Nova Datacom, Min Cho, and the defendant.  The government does not intend to credit the receivable toward forfeiture because that would prejudice USACE.  The government has already agreed to credit over $4 million in items toward the defendant's forfeiture amount, even though $907,113.54 of this amount was not actually forfeited but was returned to USACE by EyakTek.  The application of the Copper River receivable to forfeiture would limit and potentially deprive the government of the use of the forfeiture process to seize and forfeit property and then apply the value of the property to restitution through the restoration process.  Forfeiture is a much more effective tool than restitution for obtaining property for the purpose of compensating a victim for its loss.   Every dollar of Copper River funds applied to forfeiture results in one less dollar that the United States Attorney's Office can, in the future, seek to forfeit from the defendant and Min Cho and recommend to be turned over to USACE through the restoration process.[12]

The defendant claims that the government's intention not to credit the receivable to forfeiture is "inconsistent with the promises made to Alex Cho."  Def.'s Mot. at 8.  The

---

[12]     It should also be noted that despite the fact that Min Cho and Nova Datacom participated in the theft of over $20 million from USACE, counsel for Min Cho and Nova Datacom intend to argue at sentencing that their restitution obligation should be zero.

defendant does not offer any explanation of what promises were made or how the government's intention is inconsistent with those promises. At the time of the defendant's plea, the Copper River receivable did not exist. The government did not, and could not have, made any promises with regard to the receivable. Moreover, the written plea agreement contains no promises by the government to treat assets acquired by Nova Datacom in the future as payments toward forfeiture rather than restitution.

> **6.    Defense counsel's understanding that USACE owes Nova Datacom $90,000 is unsubstantiated.**

In the defendant's motion, the defendant's counsel states that he "understands" to exist a $90,000 receivable owed to Nova Datacom by USACE, and he asks the Court to credit this amount against his forfeiture obligation. Def.'s Mot. at 12. The defendant offers no explanation for this receivable his counsel "understands" to exist, and provides no support. The government is unaware of any such receivable, and the Court should not credit this sum against the defendant's forfeiture obligation.

In sum, the forfeiture amount requested by the government is consistent with the plea agreement and supported by evidence. The Court should sign and incorporate the government's proposed order of forfeiture at the time of sentencing.

> **B.    Restitution**

Restitution in this case is mandatory, because the defendant committed an offense against property. See 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). Because more than one defendant contributed to USACE's loss, the court "may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of

contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664(h).

The written plea agreement informs the defendant that the Court "must" order restitution, and states that the defendant "agrees to pay restitution to the United States as ordered by the Court."  Plea Agreement ¶ 10.  Regarding the defendant's cooperation, the written plea agreement states:

> Subject to your client's adherence to every provision of this Agreement, including his obligations to cooperate with this Office, this Office agrees to recommend at sentencing that the Court apportion liability for restitution to reflect your client's role in the offenses charged in the Information.

Id. ¶ 5.[13]

In its sentencing memorandum, the government asked the Court to order that the defendant pay restitution of $17,220,247.83 to USACE.  As shown in Exhibit B, this amount was derived by taking the total sum of money the defendant, Min Cho, and Nova Datacom stole from USACE through inflating invoices ($20,243,443.85), and crediting (1) $907,113.54 that was returned to USACE by EyakTek as part of a civil settlement, and (2) the value of invoices submitted by Nova Datacom for work it claims to have performed but was not compensated for ($2,116,082.48).   In other words, the government recommended that the Court make the defendant liable for the full amount of restitution.

The government recommended full restitution because that is the only amount that reflects the defendant's "role in the offenses charged in the Information."  Plea Agreement ¶ 5. As described in the Information, the defendant caused Nova Datacom to submit fraudulently

---

[13]     Contrary to the defendant's assertion, this restitution language did not appear in Min Cho's plea agreement.  See Def.'s Motion at 6.

inflated quotes to the USACE and Eyak Technology LLC.  Information ¶ 18.  The defendant

kept track of the fraudulently inflated amounts, referred to as "overhead,"[14] collected all of the

stolen money, and paid much of it out in bribes.  Any restitution amount less than the full amount

the defendant stole and collected would not reflect his central role in the offense.  If the Court

disagrees, then the Court can order a lesser amount pursuant to 18 U.S.C. § 3664(h).  The

government is simply recommending, pursuant to the plea agreement, "that the Court apportion

liability for restitution to reflect [the defendant's] role in the offenses charged in the

Information," and the government believes full restitution is the only amount that reflects that

role.  See Plea Agreement ¶ 5.

     Citing this language from Part 5 of the plea agreement, the defendant argues that the

parties agreed to limit restitution to the amount of stolen money (otherwise known as proceeds or

"overhead") that he retained.  That is not the case.  During plea negotiations, the defendant

requested that the government change the written plea agreement so that restitution would not be

tied to his role in the offenses but instead would be specifically limited to the amount of stolen

money he retained.  Specifically, counsel for the defendant emailed one of the prosecutors on

---

[14]    Contrary to Attorney McCool's assertion in paragraph 5 of his declaration, the
government used the term "overhead" to refer to all of the inflated amounts in the invoices and
not merely the portion of these amounts retained by the defendant, Min Cho, and Nova Datacom.
See McCool Decl. ¶ 5.  This is reflected in the definition of "overhead" contained in the
Information and the statement of offense.  See Information ¶ 18; Statement of Offense ¶ 16.
Although the defendant explicitly adopts Attorney McCool's definition of "overhead," see Def.'s
Mot. at 7 n.2, the defendant's use of the term in his motion and proposed order of forfeiture
suggests that he actually understands "overhead" to refer to the entirety of the inflated amounts.
See Def.'s Mot. at 7 (". . . limited to the 'overhead' that he and his sister (and their company,
Nova Datacom) continued to retain at the time of sentencing"); id. (". . . sufficient to offset any
retained overhead"); id. at 7-8 (". . . the overhead they initially had retained"); Def.'s Proposed
Order of Forfeiture at 1 ("'overhead' meaning the costs that were added to contracts Nova
Datacom performed for the Army Corp of Engineers").

August 30, 2011, at 3:24 p.m. and attached a document with proposed revisions.  See Exhibit D.

The proposed revision to the restitution language in Part 5 of the plea agreement read as follows,

with proposed deletions in blue and proposed additions in red:

> Subject to your client's adherence to every provision of this Agreement, including his obligations to cooperate with this Office, this Office agrees to recommend at sentencing that the Court apportion liability for restitution to reflect your client's role disgorge the proceeds retained by your client as a result of his participation in the offenses charged in the Information.

See Exhibit D.  The government was unwilling to limit restitution to the stolen money that the

defendant retained, so the government rejected the request, and the written plea agreement

between the parties retained its original language tying restitution to the defendant's role in the

offenses.  See Plea Agreement ¶ 5.

As previously discussed, the government did agree to limit the defendant's forfeiture

amount to the stolen money retained by the defendant, Nova Datacom, and principals of Nova

Datacom.  As such, the written plea agreement states this explicitly: ". . . this Office agrees to

maintain at sentencing, and to file all necessary documents with the Court to reflect, that your

client's forfeiture money judgment be the value of the proceeds retained by your client, by Nova

Datacom, or by any former or current principals of Nova Datacom."  Plea Agreement ¶ 5

(emphasis added).  In contrast, the restitution language that immediately follows this forfeiture

language in Part 5 says nothing about proceeds and instead ties liability for restitution to the

defendant's "role in the offenses."  Id.

In sum, the restitution amount requested by the government is consistent with the plea

agreement and supported by the facts.  The Court should sign and incorporate the government's

proposed restitution order at the time of sentencing.

## II.     The Court Should Deny the Defendant's Request for a Court Order Requiring the U.S. Attorney's Office to "Intervene" With U.S. Immigration and Customs Enforcement

The defendant argues that the government violated the plea agreement with respect to contact with United States Immigration and Customs Enforcement ("ICE"), and he requests that the Court order the government to "intervene" with ICE on the defendant's behalf.   The defendant requests that the intervention occur in writing and be subject to the approval of the Court and the defendant.   The Court should deny this request because the defendant has failed to establish that the government has violated or will violate the plea agreement.

At the time of the defendant's sentencing, the United States Attorney's Office intends to send a letter to the Director of ICE describing the nature and extent of the defendant's cooperation.   The letter will be written and signed by one of the undersigned attorneys on behalf of the United States Attorney, which is common practice for letters and court filings by the United States Attorney's Office.   The letter will not ask ICE to defer action on the defendant's removal, because the government believes the defendant's conduct merits removal.   Sending this letter will fulfill the government's obligations under 1) the written plea agreement, and 2) the alleged side, oral agreement described by the defendant's former lawyer, Attorney McCool. Once it sends the letter, the government will send a copy of the letter to counsel for the defendant.

### A.     The Government Has Not Violated and Will Not Violate the Written Plea Agreement

The government has not violated the terms of the written plea agreement with respect to contact with ICE.   Part 5 of the written plea agreement, entitled "Cooperation with this Office," states in part:

> This Office will bring to the Court's attention <u>at the time of sentencing</u> the nature and extent of your client's cooperation or lack of cooperation, and at the defendant's request, this Office will inform the appropriate immigration authorities about the nature and extent of your client's cooperation.

Plea Agreement ¶ 5 (emphasis added). Part 6 of the written plea agreement, entitled "Immigration," states:

> This Office agrees that, <u>at the time of sentencing</u>, provided your client's cooperation is ongoing and provided your client has adhered to every provision of this Agreement, this Office will inform U.S. Immigration and Customs Enforcement ("ICE") of the extent of your client's cooperation and, if deemed appropriate, request that ICE exercise its prosecutorial discretion consistent with the civil immigration priorities of ICE and decline to issue a detainer or a Notice to Appear and defer action on your client's removal.

Plea Agreement ¶ 6 (emphasis added). The government's obligations with respect to contact with ICE are not triggered until sentencing, which has yet to occur, so the government cannot have violated this provision.

At sentencing, the government intends to send a letter to the Director of ICE describing the nature and extent of the defendant's cooperation, which will fulfill all of the government's obligations under Parts 5 and 6 of the written plea agreement. The government is under no obligation to request that ICE decline to issue a detainer or a Notice to Appear or defer action on the defendant's removal, for two separate reasons.

First, under the plain language of Part 6, the government agreed to take action with respect to ICE only if the defendant's cooperation were ongoing at the time of sentencing. The defendant's cooperation is not ongoing, and it will not be ongoing at the time of sentencing. The defendant has not been debriefed by criminal authorities in almost two years. The defendant has not engaged in a proactive operation in over two years. The defendant's cooperation has ended,

and he does not allege otherwise in his motion.  For this reason alone, the government is under no obligation to take further action with respect to ICE.

Second, under the plain language of Part 6, the government agreed to request that ICE decline to issue a detainer or a Notice to Appear or defer action on the defendant's removal only if the government deemed it "appropriate."  The government does not deem it appropriate.  The defendant intentionally sabotaged a recorded meeting and told a target of the investigation what to say in order to minimize the target's criminal culpability.  The defendant proceeded to withhold this information during plea negotiations and only admitted to it when confronted by the government months later and after he had benefited from a generous plea agreement in the interim.  The government believed at the time of the plea agreement that it might someday be appropriate to request that ICE take action favorable to the defendant, but now that the government knows the extent of the defendant's obstruction, the government no longer holds this belief.

Informing the government's decision is the fact that previous law enforcement intervention on the defendant's behalf kept him in the United States such that he was able to commit the instant offenses.  In 1991, the defendant was convicted of burglary and larceny in state court in Virginia.  The defendant was sentenced to incarceration, and he was released on parole in 1996.  The defendant was a deportable alien based on his conviction, but he provided substantial assistance to the FBI, which in 2001 supported his application for an S visa in order to remain in the United States.  In 2005, the defendant's S visa was approved.  He was living in the United States on this visa at the time of the instant offense.  In order words, the decision by

law enforcement to intervene on the defendant's behalf last time ultimately cost the government at least $20 million.  The government will not make that mistake again.

> **B.     The Government Has Not Violated and Will Not Violate Attorney Steven McCool's "Understanding" of an Alleged Oral, Side Agreement**

The government has not violated and will not violate the terms of the alleged side agreement that Attorney McCool understood to exist.  To be clear, the government is not conceding that any such agreement existed, but rather making the point that the government has not and will not violate the terms of this alleged agreement.  For this reason, and because any side agreement would be unenforceable regardless, the Court need not make a factual determination whether such a side agreement existed.

Attorney McCool's declaration describes a meeting on August 22, 2011, with the Unites States Attorney, Ronald C. Machen Jr., and the Chief of the Criminal Division of the United States Attorney's Office, Thomas Hibarger ("Hibarger").  Attorney McCool states:

> After speaking with Mr. Machen and Mr. Hibarger, I understood that, if Mr. Cho adhered to his obligations under the eventual plea agreement, at the time of Mr. Cho's sentencing, Mr. Machen would make Mr. Cho's cooperation known to the Director of the U.S. Immigration and Customs Enforcement ("ICE") or a high-ranking ICE official and, if appropriate, request that ICE defer action on Mr. Cho's approval.

McCool Decl. ¶ 7.  Notably, Attorney McCool does not specifically allege that the U.S. Attorney or Hibarger actually made such a promise.  Instead, he alleges that this was his "understanding." Attorney McCool's "understanding" is at odds with the written plea agreement, which was finalized in September 2011.  The written plea agreement does not obligate the U.S. Attorney's Office to make the defendant's cooperation known to the Director of ICE or a high-ranking ICE

official, but rather simply to "the appropriate immigration authorities" and ICE, which are one in the same.  Plea Agreement ¶¶ 5, 6.

The government cannot have violated Attorney McCool's "understanding" because the government's obligation pursuant to this "understanding" is not triggered until sentencing, which has yet to occur.  Moreover, the government will not violate this "understanding" at sentencing because, as previously described, the government intends to send a letter to the Director of ICE describing the nature and extent of the defendant's cooperation.

The defendant argues that under the alleged side agreement, the United States Attorney agreed to personally call the Director of ICE and advocate on the defendant's behalf. Specifically, he writes, "Mr. Cho's attorney was specifically told that the United States Attorney would make a call himself to the head of Immigration and Customs Enforcement ('ICE'), John Morton at the time, to advocate on Mr. Cho's behalf and to describe all of the assistance Mr. Cho had provided to the government in dismantling the Khan/Alexander Army Corps bribery scheme."  Def.'s Mot. at 12.  This allegation is unsupported by Attorney McCool's declaration, however, and the defendant has offered no other evidence to support it.  Attorney McCool does not allege any specific statements by the U.S. Attorney, and he does not say the United States Attorney agreed to make a phone call to the Director of ICE.  Instead, he states that his "understanding" was that the defendant's cooperation would be made known to the Director of ICE or a high ranking ICE official, and that a request to defer action on the defendant's removal would only be made "if appropriate."  McCool Decl. ¶ 8.

When describing his "understanding," Attorney McCool does not say the United States Attorney agreed to "personally" contact ICE.  Instead he says, "Mr. Machen would make Mr.

Cho's cooperation known" to ICE.  As the Court knows, motions filed and letters sent by the United States Attorney's Office are filed and sent in the name of the United States Attorney. Assistant United States Attorneys, who generally file the motions and write the letters, act on behalf of the United States Attorney.  The instant motion is but one example of this practice.  At sentencing, the government will send a letter written and signed by one of the undersigned attorneys on behalf of the United States Attorney, and this will satisfy even the "understanding" described in Attorney McCool's declaration.

### C.      Even If an Alleged Oral Side Agreement Were Found to Exist, It Would Not Be Enforceable

The written plea agreement contains an integration clause in Part 16 entitled "Complete Agreement," which states:

> No other agreements, promises, understandings, or representations have been made by the parties or their counsel than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Plea Agreement ¶ 16.  The defendant and Attorney McCool signed the written plea agreement on September 8, 2011, and affirmed that they had read the written plea agreement, and that no side agreements existed outside that written plea agreement.  Id. at 14.  The defendant affirmed: "These pages accurately and completely sets [sic] forth the entire Plea Agreement."  Id. Attorney McCool affirmed: "I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Plea Agreement."  Id.  At the plea colloquy on September 20, 2011, while under oath and in the presence of Attorney Cowden, the defendant assured Magistrate

Judge Facciola that the written plea agreement was the complete agreement between him and the government, and that no side agreements existed (9/20/2011 Tr. 11-12).

The combination of the integration clause, the affirmations of the defendant and Attorney McCool in the written plea agreement, the defendant's statements while under oath during the plea colloquy, and Attorney Cowden's silent acquiescence during that colloquy forecloses the existence of any promises outside of the written plea agreement.  See West, 392 F.3d at 456. Therefore, even if an alleged side agreement existed with regard to contact with ICE, it would be unenforceable.

**III.     The Defendant Should Not Be Released From Custody**

Rather than file a motion for bond, the defendant couches his request for release in the guise of a motion to enforce the plea agreement.[15]  The defendant argues that the government violated part 12 of the plea agreement when it requested revocation of his release status.  The defendant cites a sentence in part 12 in which the government agreed it would "not seek a change in your client's release conditions pending sentencing."  Def.'s Mot. at 8-9.  Tellingly, the defendant does not mention the next sentence in part 12, which qualifies the government's agreement.  Part 12 reads, in its entirety:

> This Office will not oppose your client's release pending sentencing. Your client acknowledges that while this Office will not seek a change in your client's release conditions pending sentencing, the final decision regarding your client's bond status or detention will be made by the Court at the time of your client's plea of guilty.  This Office may move to change your client's conditions of release if your client engages in further criminal conduct prior to sentencing or if this Office

---

[15]     The defendant is not actually seeking to enforce the plea agreement.  If he were, he would be asking the Court to order the government to withdraw its request for revocation of release conditions.  Instead, the defendant is asking the Court, which is not bound by the plea agreement and which is the sole arbiter of the defendant's conditions of release, to release him back into the community.  This is plainly a motion for bond.

<u>obtains information that it did not possess at the time of your client's plea of guilty and that is relevant to whether your client is likely to flee.</u>

Plea Agreement ¶ 12 (emphasis added).

On November 3, 2011, the government obtained information that it did not possess at the time of the defendant's guilty plea.  The government learned that the defendant had intentionally sabotaged a consensually recorded meeting by not only tipping off a target to the recording of the meeting but also telling the target what to say.  When it learned of this obstructive and criminal behavior, investigators immediately determined the defendant could no longer be trusted to cooperate with the investigation.  Moreover, the defendant's misconduct called into question whether the Departure Committee of the U.S. Attorney's Office would agree to sponsor a 5K1.1 departure at his sentencing.

The defendant's deliberate interference with the investigation on August 18, 2011, his failure to notify investigators of his obstructive acts, the termination of his cooperation, and the uncertainty related to his 5K1.1 departure were all deemed highly relevant by the government to the likelihood the defendant would flee.  The Court agreed, and it revoked the defendant's conditions of release.  Under the plea agreement, the information need only be "relevant" to whether the defendant is likely to flee, and the information the government learned about the defendant on November 3, 2011, easily meets that standard.  <u>See</u> Plea Agreement ¶ 12.  As such, the government did not breach the plea agreement.

The defendant claims that he seeks release from custody not so he can flee but so he can self-report to prison, because the defendant's attorney "understands" that self-reporting "will affect favorably (and materially) the scoring Mr. Cho receives under the Bureau of Prison's Inmate Classification System."  Def.'s Mot. at 12-13.  Even if self-reporting would have a

material effect on the defendant's security classification, this would not be a sufficient justification to release him in light of the facts that make him a flight risk.  In other words, the defendant's desire to serve his prison sentence in a certain type of prison does nothing to establish "clear and convincing evidence that [the defendant] is not likely to flee," as required by 18 U.S.C. § 3143(a).  The defendant has not even come close to meeting his burden to establish such evidence.

Moreover, the defendant offers no authority to support his "understanding" that self-reporting will materially affect his security classification, and his understanding is almost certainly wrong.  Self-reporting will not change the type of facility where the defendant serves his sentence.  Under Bureau of Prisons Program Statement P5100.08, self-reporting only affects an inmate's "security point total."  See Bureau of Prisons Program Statement P5100.08 at Chapter 6, Page 8.[16]  An inmate who is permitted to surrender voluntarily receives three points off of his total.  Id.  Male inmates with a point total of 0-11 are eligible for minimum security facilities, provided other public safety factors are not present.  Id. at Chapter 1, Page 2.  The defendant already has a point total within the 0-11 range, so a further reduction of three points will have no effect on his eligibility.  The defendant's likely point total is 8:

| | |
|---|---|
| Moderate Severity Offense (property offense over $250K) | 3 points |
| Criminal History Score of 3 | 2 points |
| Minor History of Violence over 15 Years Ago | 1 point |
| Age (36-54) | 2 points |
| **Total** | **8 points** |

---

[16]     Program Statement P5100.08 is available at: http://www.bop.gov/policy/progstat/5100_008.pdf.

The defendant is scheduled to be sentenced in a little over six weeks, on March 28, 2013. Given his conduct and his Sentencing Guidelines range, he will almost certainly receive a prison sentence that exceeds the amount of time he has already served.  Releasing him now would serve no purpose but to give him an opportunity to flee.  The Court should deny the defendant's request because he has failed to establish clear and convincing evidence that he is not likely to flee, as required by 18 U.S.C. § 3143(a).

**IV.     No Evidentiary Hearing is Required to Resolve the Defendant's Motion**

The defendant did not request an evidentiary hearing related to his motion.  The government does not request an evidentiary hearing and believes such a hearing is unnecessary.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

By:     _____/s/_____
MICHAEL K. ATKINSON
BRYAN SEELEY
ANTHONY D. SALER
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
(202) 252-7822 (Seeley)
Bryan.Seeley@usdoj.gov

Dated: February 18, 2014

**<u>Certificate of Service</u>**

I certify that I caused to be served a copy of the foregoing by electronic means on counsel of record for defendant Young N. Cho, William Cowden, on this 18th day of February, 2014.


_____/s/_____
Bryan Seeley